*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

PATRICIA BURLIN TUTTLE,

                      *Plaintiff-Appellant/*
                         *Cross-Appellee,*

      *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE,

                      *Defendant-Appellee/*
                         *Cross-Appellant.*

Nos. 05-6055/6471

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-01063—William J. Haynes, Jr., District Judge.

Argued: July 18, 2006

Decided and Filed: January 18, 2007

Before: MARTIN and RYAN; Circuit Judges; MARBLEY, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellee. **ON BRIEF:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellee.

─────────

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

ALGENON L. MARBLEY, District Judge.

## I. INTRODUCTION

Plaintiff Patricia Burlin Tuttle appeals from the district court's entry of judgment as a matter of law in favor of Defendant, stemming from Defendant's termination of Plaintiff's employment. Following a full trial on the merits, which resulted in a jury verdict in favor of Tuttle in the amount of $199,200.00, the district court granted Defendant's renewed motion for judgment as a matter of law on Tuttle's claims under the Age Discrimination in Employment Act of 1967 and retaliation. After the district court entered its judgment, and after Tuttle timely filed a Notice of Appeal, Defendant filed a Motion for the Conditional Grant of a New Trial, which the district court denied as untimely. Defendant filed a Notice of Cross-Appeal. For the reasons set forth below, we AFFIRM in part and REVERSE in part the district court's decisions.

## II. BACKGROUND

### A. Facts

#### 1. Tuttle's Employment with Metro

Plaintiff Patricia Burlin Tuttle ("Tuttle") is a 63-year-old woman who was employed by Defendant Metropolitan Government of Nashville and Davidson County, Tennessee (hereafter, "Metro") from November 14, 1994 until March 4, 2002, when Defendant fired her.

Tuttle worked in various clerical positions at Metro until 1998, when she was promoted to Account Clerk II in Metro's Department of Public Works. As an Account Clerk II, Tuttle received positive employment reviews from her supervisor, Renesa Davis ("Davis"). On October 1, 1999, Tuttle was promoted to Account Clerk III, where her duties included answering and dispatching telephone calls, submitting payroll information, recording employee attendance, and processing work orders, among other things. Tuttle successfully completed the standard six-month probationary period for the Account Clerk III position.

Tuttle's first supervisor in the Account Clerk III position was Mike McCallister. When McCallister resigned in July 2000, George Sullivan ("Sullivan") became Tuttle's next supervisor. On one occasion, Sullivan instructed Tuttle to correct some payroll errors that had occurred when Metro began using a new payroll system. Tuttle resisted making the corrections, arguing that the employee who caused the problems should correct them and explaining that she had substantial work of her own to do because she recently had been out of the office for medical reasons.

In August 2000, Tuttle reported to John Walker ("Walker), the human resources manager for Metro's Department of Public Works, that she had observed Sullivan and Cheryl Harrington ("Harrington"), one of Tuttle's co-workers, destroying documents. Sullivan and Harrington denied that they had destroyed any documents. Metro investigated, but it did not identify any evidence to support Tuttle's accusation. Thereafter, Tuttle's relationship with Harrington began to decline.

On October 3, 2000, Sullivan submitted a performance evaluation for Tuttle, and he rated her "below expectations" in the area of peer relations, referencing the incident when Tuttle refused to follow his instructions to make payroll corrections. This was the first time Tuttle ever received any unfavorable performance evaluation in her time at Metro. Tuttle maintains that Sullivan was

motivated by retaliation for Tuttle having reported the complaint against Sullivan and Harrington regarding the destruction of documents.

When Sullivan retired from Metro on February 28, 2001, Chase Anderson ("Anderson") became Tuttle's new supervisor. During the time that Anderson supervised Tuttle, there were various complaints issued by Metro employees against Tuttle.[1] When Anderson consulted Walker about some of Tuttle's performance deficiencies, Walker instructed him to begin documenting any of Tuttle's employment issues for her file. Anderson subsequently reassigned Tuttle's payroll responsibilities to Harrington.[2]

Anderson did not complete timely Tuttle's annual performance evaluation, which was due on October 1, 2001. On several occasions after October 1, 2001, Tuttle reminded Anderson that she needed him to complete her evaluation so that she could obtain her annual pay increase, but Anderson did not complete her evaluation.[3] Anderson timely completed and submitted his other subordinate employees' performance evaluations. He completed Tuttle's evaluation, which was unfavorable, on January 15, 2002, more than three months late.

In October 2001, Anderson transferred Tuttle out of her office position to the "scale house booth" at Metro's thermal plant, where Tuttle worked twelve-hour days in relative isolation weighing Metro's garbage trucks. The scale house booth was about four miles away from the office where Tuttle previously had worked. When he transferred Tuttle to the scale house booth, Anderson told her that it would be a temporary transfer, and he estimated that she would only work there for thirty to thirty-five days, after which she would return to her Account Clerk III position. Tuttle worked for five months in the scale house booth with no documented job performance problems.

### 2. Tuttle's EEOC Complaint Against Metro

On December 6, 2001, Tuttle filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") against Metro, alleging that she had been discriminated against on the basis of her age. Metro was served with the Charge on December 10, 2001.

On December 19, 2001, Walker drove out to the scale house booth, where Tuttle was working at the time. When he arrived at the scale house booth, Walker told Tuttle that she would have either to transfer out of the Metro's Department of Public Works and into another Metro department or else she would receive an unfavorable evaluation and be demoted or terminated. Tuttle responded to Walker that she wanted to think about it before she made the decision to transfer out of the Department of Public Works. Shortly thereafter, Tuttle requested a transfer to the Metro's

---

[1] The workplace disagreements involving Tuttle include: (1) a dispute between Harrington and Tuttle over Tuttle's alleged removal of perfect attendance documentation from Harrington's employee file; (2) complaints about three incidents (in March, June, and July of 2001) when Tuttle did not submit payroll information by the noon deadline, in accordance with Metro policy; (3) a dispute with another Metro employee over a candy dish; (4) a complaint by Jack Tucker, one of Tuttle's co-workers, that Tuttle had placed public phone lines on "do not disturb" when employees were in the office, allegedly in violation of a direct order; (5) complaints from Kristen Dietrick that Tuttle improperly routed public telephone calls; (6) a complaint from one of Metro's mechanics that Tuttle had been rude to him; and (7) a complaint that Tuttle had removed records from another employee's desk without permission.

[2] Additionally, Anderson gave Tuttle the mock title "Supervisor of the 'Fridge,'" which required Tuttle to clean out the office refrigerator on a weekly basis. No other Metro employee has ever been assigned that title or those responsibilities.

[3] Eventually, to obtain her pay raise, Tuttle went before a benefit review board, which gave her the pay increase over three months late.

Motor Pool Department, but she was advised that the Motor Pool Department would not entertain any new transfers because of a hiring freeze.

### 3. *Tuttle's Termination From Metro and Her Administrative Appeals*

On January 15, 2002, Anderson submitted Tuttle's annual performance evaluation, which she failed. In an addendum to the evaluation, Anderson noted that Tuttle's job performance was not acceptable due to her "poor social skills," "poor work habits," and "lack of honesty." Moreover, Anderson recommended, based on her poor evaluation, that Tuttle be subject to discipline, up to and including termination. After a disciplinary hearing before Walker in February 2002, Walker concluded that there was ample evidence to terminate Tuttle's employment. Walker then recommended to the Director of the Department of Public Works that Tuttle's employment be terminated, and Metro terminated Tuttle's employment, effective March 4, 2002. On March 18, 2002, Tuttle filed a second Charge of Discrimination with the EEOC against Metro, alleging age discrimination and retaliatory discharge.

Tuttle next appealed her discharge to the Metro Civil Service Commission (the "Commission"), an administrative agency. On July 17, 2003, an administrative law judge ruled that, based on its factual findings, Metro had just cause to terminate Tuttle.[4] The full Commission upheld the administrative law judge's decision in an order dated September 10, 2003. Finally, Tuttle pursued review of the administrative record with the Chancery Court for Davidson County, Tennessee, which upheld the Commission's decision by an order dated August 24, 2004. Significantly, the Commission did not consider or decide Tuttle's age discrimination or retaliation claims because it did not have jurisdiction to adjudicate them.

## B. Procedural History

### 1. *Pre-Trial Proceedings*

On November 12, 2002, Tuttle filed a suit in federal court against Metro and Chase Anderson, asserting claims of age discrimination, retaliatory discharge, and intentional and negligent misrepresentation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq.*, and the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, as well as Tennessee common law claims of misrepresentation and outrageous conduct. Each of Tuttle's claims arose from her treatment during and termination of her employment with Metro. Anderson was included as a defendant in Tuttle's complaint because he was Tuttle's supervisor prior to her termination.

On September 30, 2004, Metro and Anderson filed a motion for summary judgment, and on January 21, 2005, the district court dismissed Tuttle's outrageous conduct claim, but it otherwise denied the defendants' motion. In April 2005, Metro and Anderson each filed a motion for judgment on the pleadings, and on May 31, 2005, the district court granted those motions, leaving only the ADEA claims against Metro and the common law misrepresentation claim against Anderson for trial. On June 3, 2005, the district court entered an order, pursuant to a negotiated settlement

---

[4] The administrative judge who heard Tuttle's case found that Tuttle: (1) failed to answer the main office telephone line; (2) failed to notify persons to cover her telephone duties when she was out of the area; (3) continuously put the main telephone line on hold; (4) failed to put payroll information in by the deadline and required other employees to fulfill her obligation; (5) put fuel tickets erroneously into the computer, and failed to cooperate with her co-workers who attempted to correct her; (6) altered time sheets of a co-employee, Ms. Harrington, by crossing out references to her perfect attendance; and (7) created serious employee problems over ownership of a candy dish.

between the parties, that dismissed all claims against Anderson, leaving only the ADEA claims against Metro for trial.

## 2. Trial Proceedings

Tuttle's ADEA claims against Metro were tried before a jury from June 14, 2005 through June 17, 2005. During trial, Tuttle testified that various Metro employees made discriminatory age related statements directed at her. For example, in February 2001, Sullivan, Tuttle's former supervisor, allegedly said to her, "How old are you? . . . You will be retiring quicker than you think." In March 2001, Tucker, one of Tuttle's co-workers who supervised the office when Anderson was out, authored an email to Anderson stating, "This woman has no business on a PC." On another occasion, when Tuttle asked Anderson whether he was trying to "get rid" of her, Anderson allegedly replied, "There have been others, and they took their retirement or pension." In a meeting between Anderson and Tuttle in July 2001, Anderson told her, "I want to apologize for causing you stress. I wouldn't want anything to happen to my mother and dad." Finally, in August 2001, another Metro employee commented to Tuttle that "there will always be problems with hiring people over the age of 55."

Tuttle also testified that the negative reviews of her job performance were discriminatory. According to Tuttle, during her employment with Metro, she was treated differently than other similarly situated employees. She noted that her unfavorable reviews resulted in Metro stripping her of her job duties, giving her menial tasks, such as the responsibility of being "Supervisor of the 'Fridge,'" transferring her to the scale house booth, and ultimately terminating her. In comparison, Kristen Dietrick, one of Tuttle's younger former co-workers, received a negative performance evaluation from Anderson based upon, *inter alia*, her difficulty in working with others, but Metro gave her an opportunity to improve without consequence. Harrington, who took over Tuttle's payroll responsibilities, made mistakes entering the payroll, but Metro never disciplined her at all for them. Additionally, Tuttle offered testimony from another former Metro employee who believes he was subjected to adverse employment actions because of his age, and from her husband, a current Metro employee, who testified to how Tuttle's termination affected her.

After the close of Tuttle's case-in-chief, Metro made an oral motion for judgment as a matter of law ("JMOL") on Tuttle's age discrimination and retaliation claims. First, Metro argued that Tuttle's age discrimination claim failed because she did not present proof to support the required element that she was replaced by a younger employee. Second, Metro contended that the age discrimination claim failed because Tuttle did not provide evidence to show pretext. Third, with respect to the retaliation claim, Metro claimed that Tuttle failed to provide evidence to show that there was a causal link between Tuttle's first Charge of Discrimination with the EEOC, a protected activity, and her termination. Tuttle responded to Metro's arguments, and the district court reserved judgment on Metro's JMOL.

During Metro's case-in-chief, it focused its proof on the substance of Tuttle's various disputes with other Metro employees and her other job performance deficiencies to show that it had a legitimate, non-discriminatory reason to terminate her. During the trial, Walker, Anderson, Harrington, Tucker, and Davis, among others, each testified.

At the close of its proof, Metro orally renewed its motion for JMOL. Again, Tuttle responded, and the district court reserved judgment on Metro's motion for JMOL. Subsequently, the district court delivered the jury instructions, including Tuttle's claims of age-related disparate treatment, discriminatory discharge, and retaliation.

On June 17, 2005, after deliberation, the jury returned a verdict in favor of Tuttle on her ADEA and retaliation claims. The jury awarded Tuttle $199,200.00 in damages. The district court then excused the jury.

### 3. Post-Trial Proceedings

After the district court excused the jury, Metro renewed its JMOL. In response, the district court orally ruled on Metro's motion for JMOL, stating:

> I am going to grant the motion for judgment as a matter of law in favor of the defendant. The Court finds, based upon all the proof, that there is no basis for the conclusion that the defendant's decision in this case was based upon the plaintiff's age. The Court finds that there is also insufficient proof that the decision made by the defendant in terminating her was in retaliation for her filing of an Equal Employment Opportunity charge.

Later that day, the district court entered a written order granting Metro's motion for JMOL and dismissing the case with prejudice. In its written decision, the district court stated:

> The proof presented at trial demonstrated overwhelming evidence that: (1) Defendant had legitimate, non-discriminatory bases for terminating Plaintiff's employment, as reflected in the final state court judgment based upon several administrative hearings; (2) the alleged age-based comments directed at Plaintiff were made by Plaintiff's co-workers and a retired acting supervisor who did not decide to terminate Plaintiff, and the one alleged remark made by a supervisor was made at a time not temporally connected with Defendant's decision to terminate Plaintiff; and (3) notwithstanding Plaintiff's poor performance evaluations, Defendant exercised its best efforts to retain Plaintiff as an employee.

> The Court is convinced that the jury verdict was based solely on the jury's sympathy to the Plaintiff and not the facts and law at issue in this action. The Court concludes that honoring the jury verdict would constitute a miscarriage of justice.

On June 21, 2005, Tuttle timely filed a Notice of Appeal, seeking review of the district court's ruling on Metro's motion for JMOL and of the district court's refusal to give a requested jury instruction. On June 27, 2005, Defendant filed a Motion for Conditional Grant of a New Trial in an attempt to preserve its right to a new trial if the district court's decision on its motion for JMOL were reversed on appeal, but on August 30, 2005, the district court denied that motion as untimely. On September 9, 2005, Metro timely filed a Notice of Cross-Appeal, seeking review of the district court's denial of its Motion for Conditional Grant of a New Trial and of the district court's allegedly inadequate jury instruction.

## III. ANALYSIS

As a threshold matter, we must address Tuttle's appeal of the district court's ruling on Metro's motion for JMOL because if we uphold the district court's ruling on that issue, we need not consider the other issues on appeal, as they will be moot.

### A. Judgment as a Matter of Law in Favor of Metro

We review *de novo* a district court's grant of judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. *Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 360 (6th Cir. 2006); *Snyder v. A.G. Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir. 1995). Rule 50 provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense

that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such motions shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

Fed. R. Civ. P. 50(a). We have held that "[j]udgment as a matter of law may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005) (citations omitted).

On appeal, Tuttle argues that the district court erred when it granted Metro's JMOL, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure,[5] because the district court did so on grounds Metro did not advance in its pre-verdict motion, and because Tuttle presented sufficient evidence for its age discrimination and retaliation claims to support the jury's verdict.

### 1. Whether the District Court Granted Metro's Motion for JMOL on Grounds Metro Did Not Advance

A post-verdict judgment as a matter of law "is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury." *Amer. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997) (referencing Adv. Comm. Note, Fed. R. Civ. P. 50) ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.").

At the close of Tuttle's evidence during trial, Metro made an oral motion for JMOL, in which it argued that Tuttle's age discrimination claims failed because she had not submitted evidence to show that she was replaced by a younger employee or evidence to show pretext, and that Tuttle's retaliation claim failed because she failed to submit evidence to show that there was the requisite causal connection between some protected activity and her termination. The district court reserved judgment on Metro's motion. Metro orally renewed its motion for JMOL after the close of its own evidence during trial. Once again, the district court reserved judgment on Metro's motion. Finally, after the jury returned its verdict in favor of Tuttle, and Metro renewed its motion for JMOL for a second time, and the district court orally ruled on the motion, stating on the record:

I am going to grant the motion for judgment as a matter of law in favor of the defendant. The Court finds, based upon all the proof, that there is no basis for the conclusion that the defendant's decision in this case was based upon the plaintiff's age. The Court finds that there is also insufficient proof that the decision made by

---

[5]Rule 50(b), in relevant part, provides:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment – and may alternatively request a motion for new trial, or join a motion for new trial under Rule 59.

Fed. R. Civ. P. 50(b).

the defendant in terminating her was in retaliation for her filing of an Equal Employment Opportunity charge.

We find this oral ruling on the record, which granted Metro's motion for JMOL, was in fact based on Metro's oral arguments in its pre-verdict motions. The district court could have based its decision to dismiss Tuttle's age discrimination claims on either a finding that Tuttle had not presented evidence to show that she was replaced by a younger employee or a finding that Tuttle had not presented evidence to show pretext. Metro argued both of these issues in its pre-verdict motion for JMOL. Similarly, the district court could have based its decision to dismiss Tuttle's retaliation claim on a finding that Tuttle did not present sufficient evidence to show a causal connection between some protected activity and her termination, which Metro also argued in its pre-verdict motion for JMOL.[6] While we would have preferred for the district court to discuss its findings with more specificity so that we could review its decision more meaningfully, we cannot reverse the district court's decision on Metro's motion for JMOL for that reason.

Even so, we still must determine whether the district court erred when it found that the evidence in the record does not support the jury's verdict for Tuttle on her age discrimination and retaliation claims.

### 2. Whether Tuttle Presented Sufficient Evidence to Support the Jury's Verdict on her Age Discrimination Claims

To establish a *prima facie* claim of age discrimination under the ADEA, a plaintiff must show that: (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004) (citation omitted). The fourth element may be satisfied "by showing that similarly situated non-protected employees were treated more favorably." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 511 (6th Cir. 2004) (quoting *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995)); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("[T]o be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).[7] If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action. *Id*. (citation omitted). If the defendant then articulates such a reason, the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination. *Id*. (citation omitted).

During its oral motion for JMOL on Tuttle's ADEA claims before the district court, Metro argued that it should be dismissed because Tuttle could not satisfy the fourth element of that claim,

---

[6]Tuttle bases her entire argument on this issue by analyzing the district court's written order granting Metro's motion for JMOL, but she never addresses the effect of that court's oral ruling on the record. We agree that the written order, in and of itself, may have been based inappropriately on grounds that Metro did not advance, but we find that the district court's written order should be analyzed as a supplement to, and not a substitute for, the district court's ruling from the bench on the record.

[7]We note that "[w]hen reviewing the facts of a discrimination claim after there has been a full trial on the merits, we must focus on the ultimate question of discrimination rather than on whether a plaintiff made out a prima facie case." *Barnes*, 401 F.3d at 736 (6th Cir. 2005).

and thus, she could not establish a *prima facie* case of age discrimination. Additionally, Metro contended that Tuttle's age discrimination claims failed because she did not introduce evidence to show pretext after it provided a legitimate, non-discriminatory reason for terminating her employment. We will address both of Metro's arguments here.

### a. Fourth element of the *prima facie* case

One way that Tuttle could satisfy the fourth element of her age discrimination claim is by providing evidence that she was replaced by a younger worker. *Rowan*, 360 F.3d at 547. During the trial, Tuttle presented evidence that Jennifer Campbell Henry, a woman in her twenties who Metro classified as a temporary employee, assumed Tuttle's Account Clerk III job duties after Metro transferred Tuttle to the scale house booth.[8] Walker, Anderson, and Harrington each testified at trial that Ms. Henry performed Tuttle's former job responsibilities in the office,[9] but they suggested that Tuttle was not replaced by Ms. Henry because she was simply a temporary employee. We find that the fourth element of the *prima facie* case in an age discrimination case can be met even where the new hire, who is a member of the non-protected class, has the title of "temporary" employee. In cases where the new hire takes on the plaintiff's former job responsibilities, merely designating the new hire "temporary" will not defeat the fourth element. Based upon the testimony presented during trial, the jury had a "legally sufficient evidentiary basis" to find for Tuttle on the issue of whether she had been replaced by a younger worker. *See* Fed. R. Civ. P. 50(a).

Alternatively, Tuttle could satisfy the fourth element of her *prima facie* claim of age discrimination by providing evidence that similarly situated non-protected employees were treated more favorably than she was treated. *Coomer*, 370 F.3d at 511. During trial, Tuttle presented evidence and testimony that Anderson, Tuttle's former supervisor, treated two of her younger former co-workers, Harrington and Kristen Dietrick, more favorably than he treated her, despite their comparable workplace issues. For example, Anderson testified that one reason why Tuttle was terminated is that there were three documented occasions on which Tuttle has problems completing her payroll responsibilities. Anderson continued that when Harrington assumed those responsibilities in July 2001, however, her mistakes on the payroll were never documented in her personnel file. Similarly, Metro argued during trial that Tuttle was discharged because of the annual performance evaluation Anderson completed for her in January 2002, which Tuttle failed, based largely upon her perceived inability to work well with others. Nevertheless, when Anderson evaluated Dietrick similarly in May 2003,[10] he did not recommend Dietrick's discharge. Based

---

[8]The record indicates that Harrington was assigned Tuttle's previous payroll responsibilities in July 2001, before Metro transferred Tuttle to the scale house booth.

[9]In fact, during Harrington's trial testimony, Tuttle's counsel reviewed Harrington's prior sworn testimony when she was questioned on this issue. In that prior testimony, Harrington stated:

Question. And the position [Tuttle] was in has been filled?

Answer. No, I had an [sic] temp.

Question. Are the reports being done by that temp, or are those job responsibilities that were [Tuttle's]?

Answer. The temp is doing just about all the jobs, except I'll kind of help her still with the billing. But other than that, she's doing all of the fuel tickets. She's doing it all.

[10]In an addendum to her May 2003 performance evaluation, Anderson stated:

Ms. Dietrick [] needs to work on her ability to work with others. She needs to treat peers as peers and

upon the testimony and documents presented during trial, the jury had a "legally sufficient evidentiary basis" to find for Tuttle on the issue of whether Metro treated other similarly situated non-protected employees more favorably than her.  *See* Fed. R. Civ. P. 50(a).

### b. Pretext

In its JMOL motion, Metro further argued that Tuttle's age discrimination claims failed because she did not introduce evidence to show pretext after Metro provided a legitimate, non-discriminatory reason for terminating her employment.[11]  In an age discrimination case, a plaintiff can establish pretext by demonstrating "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 529 (6th Cir. 2005) (internal quotation marks and citation omitted).

Tuttle argues that she established pretext at trial by pointing out inconsistencies in Anderson's sworn testimony regarding his failure to complete timely Tuttle's annual performance evaluation and his intentions when he transferred Tuttle to the scale house booth.  Under state civil service rules, Anderson was obligated to complete Tuttle's annual performance evaluation by October 1, 2001.  The record indicates that, on a few occasions, Tuttle reminded Anderson that her evaluation was past due, yet Anderson did not complete it until January 15, 2002, over 105 days late.[12]  When he testified before the Metro Civil Service Commission about the reason for his untimely completion of Tuttle's evaluation, Anderson stated that it had "slipped his mind."  During his deposition testimony in this case, he testified that he was "too busy" to complete Tuttle's evaluation.  During trial, Anderson testified that he did not complete Tuttle's evaluation on time because he thought she was planning to transfer to another Metro department, and he did not want his unfavorable performance evaluation of her to affect her transfer opportunities.  With respect to Tuttle's transfer to the scale house booth, Anderson initially explained to Tuttle that it would only be a 30-day temporary transfer, after which Tuttle could return to her Account Clerk III duties.  Tuttle actually spent nearly five months working in the scale house booth, and Anderson testified that, at the time of her transfer, he never intended for Tuttle to return her Account Clerk III position.  Tuttle argues that Anderson's inconsistent statements on these issues are evidence that Metro's

---

bring co-workers into the campaign to increase recycling and clean up Nashville.  A case in point was a dispute that she had with another employee.  Although Ms. Dietrick had well founded complaints, she refused to acknowledge the other person's wishing to work in an environment free from name calling and other detrimental acts.  Ms. Dietrick's refusal to acknowledge this simple request, shows an immaturity in working within a team structure.

[11]To prove its legitimate, non-discriminatory reason for terminating Tuttle, Metro introduced testimony and documents to describe many of Tuttle's work deficiencies while she was employed as an Account Clerk III.  Additionally, to meet its burden of production on that issue, Metro relied upon the factual findings of the Metro Civil Service Commission, which ruled that Metro had just cause to terminate Tuttle.  Those findings, however, do not preclude Tuttle's claims here because the Metro Civil Service Commission did not consider the issue of age discrimination in its decision. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1268–70 (6the Cir. 1986) (holding that an administrative agency or a state court's finding that an employer had just cause to terminate a plaintiff is not preclusive with regard to the plaintiff's discrimination claim against the employer).

On appeal, Metro argues that it is entitled to JMOL because Tuttle cannot establish pretext due to the "honest belief rule," the "same actor" defense, and a staleness argument, but we will not consider any of these issues here because Metro did not present them to the district court in its motion for JMOL. *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) ("Issues not presented to the district court but raised for the first time on appeal are not properly before the court.") (internal quotation marks and citation omitted).

[12]Anderson's trial testimony indicates that he completed the performance evaluations for each of his other 135 subordinate Metro employees.  The only evaluation that he submitted late was Tuttle's.

proffered reasons for firing her did not actually motivate her discharge. *See Tisdale v. Fed. Express Corp.*, 415 F.3d at 529.

Furthermore, Tuttle testified that various Metro employees made discriminatory age-related statements to or about her. *See Talley*, 61 F.3d at 1248 ("[T]he plaintiff's evidence regarding racial slurs may also have been considered on the issue of whether [a defendant's legitimate, non-discriminatory] reason was merely a pretext."). During trial, Tuttle provided evidence of the following age-related statements directed toward her: in February 2001, Sullivan, Tuttle's former supervisor, said to her, "how old are you? . . . you will be retiring quicker than you think"; in March 2001, Tucker, one of Tuttle's co-workers who supervised the office when Anderson was out, authored an email to Anderson stating, "this woman has no business on a PC"; on another occasion, when Tuttle asked Anderson whether he was trying to "get rid" of her, Anderson replied, "there have been others, and they took their retirement or pension"; in a meeting between Anderson and Tuttle in July 2001, Anderson told her, "I want to apologize for causing you stress. I wouldn't want anything to happen to my mother and dad." While these statements may not rise to direct evidence of age discrimination, they could have provided circumstantial evidence to the jury of such discrimination.

Based upon the evidence Tuttle presented during trial as to Anderson's inconsistent testimony and statements regarding Tuttle's 2001 performance evaluation and her transfer to the scale house booth, in addition to the age-related statements directed at Tuttle from fellow Metro employees and other evidence of discrimination, we find that the jury had sufficient evidence to find for Tuttle on the issue of pretext.

### 3. Whether Tuttle Presented Sufficient Evidence to Support the Jury's Verdict on her Retaliation Claim

To establish a *prima facie* claim of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citations omitted). If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 793 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The plaintiff then must demonstrate that "the proffered reason was not the true reason for the employment decision." *Id.* (citation omitted).

The only argument Metro raised during the trial in its oral motion for JMOL as to Tuttle's retaliation claim was that she failed to submit evidence on the element that there was a causal connection between her filing of an EEOC charge against Metro on December 6, 2001 and her termination, which took effect on March 4, 2002.[13]

The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363–64 (6th

---

[13]In its appellate brief, Metro argues, for the first time, that it was also entitled to JMOL because Tuttle failed to submit evidence on the issue of pretext. The record does not indicate that Metro ever made this argument as part of its oral motion for JMOL on Tuttle's retaliation claim. Furthermore, the issue of pretext is separate from the *prima facie* inquiry. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578–79 (6th Cir. 2000). Because we generally do not consider arguments on appeal that were not raised at trial, *Foster*, 6 F.3d at 407, we will not address Metro's argument that it is entitled to JMOL because Tuttle did not show evidence of pretext on her retaliation claim.

Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). There are, however, circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection. *See, e.g., Moore v. KUKA Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999). In *Moore*, we determined that "[t]he causal connection between the adverse employment action and the protected activity, here the filing of a complaint with the EEOC, may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees." 171 F.3d at 1080.

In this case, it is undisputed that Metro terminated Tuttle's employment less than three months after she filed an EEOC complaint against it. Tuttle also testified that on December 19, 2001, Walker, one of Metro's human resources managers, visited her at the scale house booth and threatened her that he was going either to demote her or to cut her wages if she did not transfer voluntarily into another Metro department, which Tuttle viewed as a reaction to her EEOC complaint.[14] Following the logic of *Moore*, we conclude that, in light of the close proximity of time between Tuttle's first EEOC filing and her subsequent termination and Tuttle's trial testimony about Walker's verbal threats on December 19, 2001, Tuttle presented sufficient evidence to support a jury's finding that her EEOC complaint against Metro caused her termination.

## B. Jury Instructions

Having found that the district court erred when it granted Metro's motion for JMOL, we next address Tuttle's appeal and Metro's cross-appeal relative to the jury instructions that the district court delivered during the trial proceedings. Tuttle claims that the district court erred when it refused to instruct the jury on the issue of whether Metro committed willful violations of the ADEA, and she requests that we either double the jury's damages award or award her prejudgment interest from the date of her discharge, March 4, 2002, and her reasonable attorneys' fees and costs under the ADEA. Metro claims that the district court erred when it instructed the jury that Tuttle could prevail on her ADEA claim by showing that she received an unfavorable job performance appraisal because of her age.

*1. Whether the District Court Erred When it Refused to Instruct the Jury on the Issue of Willfulness*

We review a district court's refusal to give requested jury instructions for an abuse of discretion. *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000). To find an abuse of discretion, we must have "a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996). A district court's refusal to give a requested jury instruction constitutes reversible error if: (1) the omitted instruction is a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case. *Williams v. Eau Claire Public Sch.*, 397 F.3d 441, 445 (6th Cir. 2005) (citation omitted). Nevertheless, "[i]t is error . . . to instruct the jury on an issue when there has been insufficient evidence presented to support a jury finding on that issue." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 351 (6th Cir. 2002) (internal quotation marks and citation omitted).

The statutory language provides that a court may award a plaintiff liquidated damages in the event that the plaintiff can show a willful violation of the ADEA. 29 U.S.C. § 626(b). A violation of the ADEA is considered "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v.*

---

[14]Evidence in the record indicates that Metro received notice of Tuttle's EEOC complaint on December 10, 2001.

*Thurston*, 469 U.S.111, 128–29 (1985). But because the record appears to be devoid of any evidence to support a finding that Metro knowingly violated or recklessly disregarded the ADEA, we cannot hold that the district court erred when it refused to deliver a jury instruction on the issue of willfulness.

> *2. Whether the District Court Erred When it Instructed the Jury that Tuttle Could Prevail on Her ADEA Claim by Showing that She Received an Unfavorable Job Performance Appraisal Because of Her Age*

It is the well-settled law of this Circuit that "[o]ur inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 357 (6th Cir. 2005) (quoting *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000)). We will reverse a district court only when the instructions, viewed as a whole, were confusing, misleading, or prejudicial. *Williams*, 397 F.3d at 445; *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir. 1990) (citation omitted).

Metro argues that the district court erred when it instructed the jury that:

The issues that you must address are as follows:

(1) Whether plaintiff has established that defendant discriminated against plaintiff based upon her age in violation of the Age Discrimination in Employment Act *by issuing unfavorable job performance appraisals* and/or terminating plaintiff; and if so, what are the appropriate damages, if any . . .

(emphasis added).

At issue here is whether the district court properly instructed the jury that Metro could have committed an adverse employment action against Tuttle when it issued her an unfavorable job performance appraisal based upon her age. As Metro itself notes, a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary. *Hollins v. Atlantic Co., Inc*. 188 F.3d 652, 662 (6th Cir. 1999) (citing *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)); *see also Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (holding that a negative criticism or performance evaluation, unaccompanied by a materially adverse change in the terms or conditions of employment, does not constitute adverse employment action). In this case, the district court could have found that the unfavorable job performance appraisals Metro issued on Tuttle likely resulted in both her transfer to the scale house booth and, later on, her termination from employment. The evidence in the record supports such a finding. At any rate, we conclude that the district court's jury instructions, taken as a whole, were not confusing, misleading, or prejudicial.

### C. Metro's Motion for Conditional Grant of a New Trial

Finally, Metro argues that the district court erred when it denied Metro's Motion for a Conditional Grant of a New Trial. The district court granted Metro's motion for JMOL on June 17, 2005, after the jury returned a verdict in favor of Tuttle and awarded her damages. On June 21, 2005, Tuttle timely filed a Notice of Appeal, seeking review of the district court's ruling on Metro's motion for JMOL and of the district court's refusal to give a requested jury instruction. On June 27, 2005, Defendant filed a Motion for Conditional Grant of a New Trial in an attempt to preserve its right to a new trial if the district court's decision on its motion for JMOL were reversed on appeal. But on August 30, 2005, the district court denied that motion as untimely. Metro now appeals that ruling.

We review a district court's denial of a motion for new trial for an abuse of discretion. *Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 367 (6th Cir. 2006). A district court abuses its discretion when, *inter alia*, it applies the law improperly or uses an erroneous legal standard. *Id.* (citing *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995)). In its entirety, Rule 50(c) provides:

> If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
>
> Any motion for a new trial under Rule 59 by a party against whom judgment as a matter of law is rendered shall be filed no later than 10 days after entry of the judgment.

Fed. R. Civ. P. 50(c). The text of Rule 50(c) appears to suggest that a party should make a motion for a conditional grant of new trial along with its motion for JMOL. *See id.* Moreover, according to the rule, only a party against whom a court renders judgment as a matter of law can make a motion under Rule 59 for a new trial within ten days of the court's judgment. *See id.* The record indicates that Metro did not file its Motion for Conditional Grant of a New Trial until after the district court had entered its judgment in this case, and after Tuttle filed its Notice of Appeal. Therefore, we cannot hold that the district court used an erroneous legal standard when it denied Metro's motion as untimely.

## IV. CONCLUSION

For the reasons set forth herein, we **REVERSE** the district court's decision granting Metro judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and we **AFFIRM** the district court on the alleged jury instructional errors and on its denial of Metro's Motion for New Trial. This case is **REMANDED** to the district court with instructions to reinstate the jury's verdict in favor of Tuttle as well as its award of $199,200.00 in damages.