BOYCE F. MARTIN, JR., Circuit Judge.
Carol Peck claims that Elyria Foundry Company refused to hire her because she is a woman. The district court concluded that her evidence was too weak to support a Title VII sex discrimination claim and entered summary judgment in Elyria’s favor and Peck appeals. We hold that Elyria’s contradictory explanations for not hiring Peck, combined with evidence that Elyria treated her application differently from men’s applications, could permit a jury to reasonably infer that Elyria was covering up a sexually discriminatory hiring decision. We therefore REVERSE and REMAND Peck’s discrimination claim to the district court.
I.
In June 2004, Carol Peck and her boyfriend, Brian Wolters, both filled out job applications for Elyria Foundry Company. Peck, who had worked in other foundries, listed “Grinder,” “To[w]motor,” and “?” as the “position sought” on her application.[1] Wolters, who had no foundry experience, wrote on his application that he was seeking work in “anything.”
Roughly two weeks later, Elyria hired Wolters to work in its melt shop. Peck then phoned the company two or three times a week about the status of her application, but never heard back. About a month and a half after applying, she spoke to Elyria’s human resources director, Denise Sprague, in Elyria’s parking lot (Peck was waiting to pick up Wolters from work). Peck says that Sprague told her that her application was still on her desk and that Sprague would call in a couple of days.
In late July (after the parking lot conversation between Sprague and Peck), Peck’s attorney sent Elyria’s president a letter alleging that “the company chose not to hire [Peck] because of a stereotypical decision that women cannot work in the plant.” It closed with a warning: “If I do not hear from you or your representative within two weeks, I will file a charge of discrimination.” Peck did not hear from Elyria, and so filed an employment discrimination charge against the company with the Equal Employment Opportunity Commission. After receiving a right-to-sue letter, Peck sued Elyria alleging, without further specificity, violations of Title *142 VII, 42 U.S.C. § 2000e et seq., and the Ohio Civil Rights Law. She asked the district court to order Elyria to hire her, and pay full back-pay and benefits, and to award punitive damages. Peck later sought leave to amend her complaint to add a state tort claim for refusal to hire based on her decision to contact an attorney.
The district court refused Peck’s request to amend her complaint and granted Elyria’s motion for summary judgment on Peck’s discrimination claims. Peck v. Elyria Foundry Co., 533 F.Supp.2d 759, 762 (N.D.Ohio 2008). Peck appeals.
II.
We review the district court’s grant of summary judgment de novo. Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir.2007). Summary judgment should be granted only when “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). When we review a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
III.
We analyze Title VII claims based on circumstantial evidence under the ubiquitous burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later modified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, a plaintiff must first establish a prima facie case of discrimination. DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir.2004). This creates a presumption that the defendant discriminated against her in violation of Title VII. Id. at 414 (citing Burdine, 450 U.S. at 254, 101 S.Ct. 1089). To avoid summary judgment, then, the defendant must then put forth a “legitimate, nondiscriminatory reason” for the complained of adverse treatment. Id. (citing Burdine, 450 U.S. at 253, 101 S.Ct. 1089). This explanation “must be legally sufficient to justify a judgment for the defendant.” Burdine, 450 U.S. at 255, 101 S.Ct. 1089. If the defendant meets this burden, the presumption of discrimination created by the prima facie case falls away, id. at 255, 101 S.Ct. 1089, and the plaintiff must show that the defendant’s “ ‘legitimate nondiscriminatory reason’ ” was merely a “ ‘pretext for discrimination.’ ” DiCarlo, 358 F.3d at 414-15 (quoting Bur-dine, 450 U.S. at 253,101 S.Ct. 1089). The plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, the employer’s intent to discriminate. St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
A.
A prima facie case of sex discrimination, based on Elyria’s failure to hire Peck requires her to demonstrate that men who applied to Elyria were hired instead of her, even though she was as qualified for the open positions. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 166 n. 12 (6th Cir.2004).
We begin by highlighting our disagreement with the district court’s, Elyria’s, and the dissent’s characterization of what positions Peck applied for at the foundry. The district court concluded that *143 Elyria “reasonably assumed Ms. Peck sought a position as either a ‘Chipper and Grinder’ or as a ‘Tow Motor Operator,’ ” Peck, 533 F.Supp.2d at 759 n. 1 (emphasis added). And, on appeal, Elyria attacks Peck’s claim with respect to those two positions. Had Peck only applied to those two jobs, we might have no quarrel with the district court’s conclusion that Elyria had legitimate nondiscriminatory (and unrebutted) reasons for not hiring her as a grinder or tow motor operator: its good faith belief that she had a medieal condition that would prevent her from working as a grinder, and the absence of a tow motor operator opening.
But the conclusion that Peck applied for just two jobs at the foundry is not reasonable in light of her application as it ignores the “?” that Peck wrote; Peck’s application gave Elyria ample notice that she was interested in foundry work other than just those two positions: See for yourself:
[[Image here]]
Indeed, Peck also wrote “?” under salary, and no one would think that the “?” in that spot indicated that she wanted to work for free. We thus conclude that a jury could find that Elyria had reasonable notice that Peck wanted to be considered for positions besides tow motor operator or grinder.[2] Cf. Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 661 (6th Cir.2000) (“The court first determines if a plaintiff has put forth sufficient evidence for a reasonably jury to find her to have met the prima facie requirements[.]”).
Next, we examine whether Peck was qualified for positions at the foundry. “At the prima facie stage, a court should focus on a plaintiffs objective qualifications to determine whether he or she is qualified for the relevant job.” Wexler v. White’s Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir.2003) (en banc). This burden can be met by presenting “credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria” in the field. Id. at 576. The inquiry focuses on “education, experience in the *144 relevant industry, and demonstrated possession of the required general skills.” Id.
Peck detailed five years of various foundry work, including as a tow motor operator, machine operator, packer and inspector, and chipper and grinder on her application. Her application shows at least as much, if not more, experience than many of the approximately fourteen men that Elyria hired for non-grinder positions between the time that Peck applied and the day her attorney sent the letter threatening to file the discrimination charge. During that time, Elyria hired men to various jobs including as a yard worker, shake out employee, inspector, and core finisher. Many of the men hired did not list any foundry experience, or experience in the positions for which they were hired. For example, Elyria hired J.J., who listed experience as a car dealership porter and a customer service representative, for yard work. It hired E.C., with experience as a truck unloader, material handler, and machine operator, to work as an inspector. And, in her deposition, Sprague denied that from the face of Peck’s application she was unqualified for foundry work. Thus, based on Peck’s resume and application, and her experience compared to the men that Elyria hired instead of her, we conclude that she has met the “not onerous” burden of establishing a prima facie case of sex discrimination. See Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089 (1981).
B.
Because Peck established her prima facie case of sex discrimination, the burden of production shifts to Elyria to produce evidence that it did not hire Peck because of a legitimate, nondiscriminatory reason. See id. at 255-56,101 S.Ct. 1089.
The district court (and now the dissent) concluded that Elyria “reasonably assumed” that Peck was only interested in working as a grinder or tow motor operator, and so it did not consider Elyria’s explanations for why it did not hire Peck for positions other than those two. We thus review Elyria’s nondiscriminatory reasons which, if credited, could explain why it did not hire Peck for any of the positions it filled after she applied. See Hicks, 509 U.S. at 522, 113 S.Ct. 2742 (“[T]he defendant’s ‘articulated reasons’ themselves are to be found ‘lurking in the record.’ ”).
Elyria offered several reasons for its decision, all based on statements or testimony from Denise Sprague, its director of human resources. At one point, Sprague explained that she never called Peck for an interview because she thought Peck was only looking for work as a grinder or a tow motor operator. But later, in the same deposition, her testimony suggested that she would have considered Peck for other available positions but for the fact that the company was working on improving Elyria’s women’s facilities:
Q: But in your ease, you limited her to the jobs that you felt that she was— wanted to do, just grinder and tow motor operator?
A: No. That’s not true.
* * *
Q: Why wouldn’t you consider her for anything else, other than grinder and tow motor operator?
A: I needed to get proper facilities for the women, and it was set aside on my desk.
* * *
Q: So the reason you never considered her for any other position is because you felt they didn’t have facilities?
A: At that time, correct. And we were working on [getting proper women’s *145 facilities] during that summer and then—.
For the first time on appeal, Elyria relies on this testimony as a nondiscriminatory reason for not hiring Peck, including this as one of its headings: “Elyria Foundry Needed to Attend to the Women’s Facilities Before It Could Give Further Attention to Peck’s Application.” Standing alone, delaying consideration of Peck’s application due to the lack of women’s facilities does not strike us as a particularly weighty “nondiseriminatory” reason for passing on an applicant.[3] But Sprague gave other reasons too, including reliance on a report from a former coworker that Peck did not have reliable transportation and childcare. She also explained that, though Peck’s application remained under consideration, she took “no further steps” toward hiring Peck after the company received a letter from her attorney that the company argues was “laced in insults and lies.”[4] If considered individually, these reasons could permit the conclusion that Elyria had nondiseriminatory reasons for not hiring Peck for any position at the foundry. Thus Elyria met its burden of rebutting Peck’s prima facie case by stating reasons that, on their face and individually, would be neutral reasons for not hiring Peck. See Hicks, 509 U.S. at 509, 113 S.Ct. 2742.
C.
Once Elyria met its burden of production, the court’s task, at the summary judgment stage, was to determine whether there was a legally sufficient basis for a reasonable jury to find that Elyria’s reasons were pretextual and that Elyria intentionally discriminated against Peck because of her sex. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A question of fact remains if a jury could reasonably conclude based on the evidence that Elyria’s “legitimate reasons ... were not its true reasons, but were a pretext for discrimination.” Id. at 143, 120 S.Ct. 2097 (quotations omitted). In other words, the question is whether the employer’s stated reason were its true reasons, or were, instead, phony ones offered later to cover up discrimination. In assessing pretext, a jury is free to consider the evidence establishing Peck’s prima facie case, and “inferences properly drawn therefrom.” Id. A jury’s “disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.” Hicks, 509 U.S. at 511, 113 S.Ct. 2742. Thus, if a jury could reasonably reject Elyria’s proffered reasons, it would be permitted to “infer the ultimate fact of intentional discrimination.” Id.
Employers may have more than one reason for passing on a job candidate. And considered individually, any of Ely *146 ria’s reasons for not hiring Peck could explain its hiring decision. The problem here, however, is that some of its reasons are inconsistent at best, if not outright contradictory, and are thus “so intertwined” that the credibility of any of them is in doubt. Cf. Smith v. Chrysler Corp., 155 F.3d 799, 809 (6th Cir.1998). Moreover, “an employer’s changing rationale for making an adverse employment decision can be evidence of pretext.” Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir.2002);[5] Simple v. Walgreen Co., 511 F.3d 668, 671 (7th Cir.2007) (an inconsistency is “suggestive of pretext”); Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir.2000) (holding that when a company “at different times, gives different explanations, a jury may infer that the articulated reasons are pretextual.”).
Here, it would be a logical feat for a jury to believe both Sprague’s testimony that she did not hire Peck because she thought Peck did not apply for more than two positions and that she did consider her more broadly, yet passed because she received damning input from a former coworker, and because the women’s bathrooms were not up to par. A contradiction by the same employee in the same deposition raises serious credibility concerns; either Sprague considered Peck for more than two positions or she did not.[6]
There are other weaknesses in Elyria’s explanations as well. Why, for example, would Peck’s application “remain[ ] active” until Peck’s attorney sent the letter if, as the company maintains, it “should not feel compelled to interview a candidate who ... has a history of poor attendance at a former place of employment”? A poor attendance record is a legitimate nondiscriminatory reason to exclude an applicant for consideration for any position. But if a report of Peck’s attendance issues dissuaded Elyria from hiring Peck, it does not follow that Elyria would have had any reason to keep Peck’s application under consideration.
Setting these inconsistencies aside, other evidence undermines the credibility of Elyria’s explanation. Peck submits evidence that, at least sometimes, Elyria hired men for positions that differed from what they specified on their applications. Yet, as we explain above, Sprague testified (at one point in her deposition) that the reason she never phoned Peck for an interview was “because her application was based on chipping and grinding.” Why would Sprague limit her consideration of Peck’s application to two positions (ignoring altogether the “?” on her application) when she apparently did not make such assumptions of male applicants? Cf. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d *147 1078, 1083 (6th Cir.1994) (describing insufficiency of explanation as a method of attacking credibility).
Our conclusion that these inconsistencies suggest pretext does not mean that a company is precluded from pursuing alternative lines of defense to convince a jury that its decision was not motivated by sex discrimination. But at the summary judgment stage, a plaintiff may meet her burden of demonstrating pretext by showing, in addition to proffered evidence, that an employer’s reasons are so incoherent, weak, inconsistent, or contradictory that a rational jury could conclude the reasons were not believable. See, e.g. Cicero, 280 F.3d at 592 (observing that a conflict “raises an issue whether the proffered reason truly motivated the defendant’s decision.”) (quoting Thurman v. Yellow Freight Sys., 90 F.3d 1160, 1167 (6th Cir.1996); Tuttle v. Metro. Gov. of Nashville, 474 F.3d 307, 319-20 (6th Cir.2007); cf. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir.2005); Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir.2004)).[7]
We consider these inconsistencies and implausibilities in addition to Peck’s circumstantial evidence of discrimination. See Reeves, 530 U.S. at 143,120 S.Ct. 2097. There is no evidence in the record that any of the men Elyria hired instead of Peck were more qualified than she, who had worked in various foundry positions. In fact, Peck listed experience as a foundry inspector on her resume, while E.C., a man Elyria hired to the position instead listed no foundry experience at all, let alone as an inspector. And Elyria’s argument that Peck was not “similarly-situated” to male applicants for non-grinder positions is a non-starter: Elyria has pointed to no evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry.[8]
Elyria may be able to reconcile some of the seemingly contradictory aspects of its explanation or it may be able to explain away apparent differences between how it treated Peck and the men it hired instead of her; indeed, the trial may cast the facts in a different light. But at the summary judgment stage, we must view the record “taken as a whole” and disregard evidence favorable to Elyria “that the jury is not required to believe.” Reeves, 530 U.S. at 150, 120 S.Ct. 2097 (internal citation omitted). On this record, the combination of Elyria’s inconsistent reasons and evidence that Elyria hired men who lacked foundry experience instead of Peck could lead a reasonable jury to infer sex discrimination. Thus, the case cannot be resolved on summary judgment.
IV.
Finally, we can quickly dispense with Peck’s argument that the district court erred by refusing to allow her to amend her complaint to set forth a public policy tort of refusal to hire. She acknowledges that “Ohio courts have yet to recognize the *148 public policy tort of failure to hire,” but urges this Court should apply the tort where “a Plaintiff is not hired in whole or in part because she contacted an attorney.” In the absence of controlling state precedent, we must determine whether Ohio courts extend its public policy exception to employment-at-will to a situation involving a person who is seeking employment.
The Ohio Supreme Court recognizes a public policy exception to employment-at-will “when an employee is discharged or disciplined for a reason which is prohibited by statute.” Greeley v. Miami Valley Maint. Contractors, Inc., 49 Ohio St.3d 228, 551 N.E.2d 981, 986 (1990). The exception also applies when “dismissing employees” would “jeopardize” a public policy that is “manifested in a state or federal constitution, statute, or administrative regulation, or in the common law.” Collins v. Rizkana, 73 Ohio St.3d 65, 652 N.E.2d 653, 657 (1995). But Peck directs us to no case suggesting that Ohio would extend the tort to a failure to hire case. Thus, we follow federal district courts within the Circuit which have concluded that a “review of Ohio law finds no case extending the public policy tort to claims involving a wrongful failure to hire or retaliation.” Bools v. Gen. Elec. Co., 70 F.Supp.2d 829, 832 (S.D.Ohio 1999).
V.
For the reasons described above, we AFFIRM the district court’s denial of Peck’s motion for leave to amend her complaint. We REVERSE and REMAND its grant of summary judgment in Elyria’s favor on her sex discrimination claims.

. The parties use the terms "grinder” and "chipper and grinder" to describe a single position.

. The dissent finds our reading of Peck's application "sheer speculation” because a "question mark” is, according to one definition in Webster’s, "something unknown, unknowable, or uncertain.” First, we observe that the "?” is separated from “tomotor” with a hyphen, which would indicate that it was intended as a third alternative. Second, we do not speculate; rather, as we must at the summary judgment stage, we resolve all reasonable inferences in Peck's favor. The dissent's alternative theory merely reinforces the existence of a "genuine issue of material fact” as to whether Peck applied for other positions. See Dews v. A.B. Dick Co., 231 F.3d 1016, 1022-23 (6th Cir.2000) (quoting Hicks, 509 U.S. at 509-10, 113 S.Ct. 2742) (“If ... reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a [Title VII] prima face case, then a question of fact does remain, which the trier of fact will be called upon to answer.”).

. See, e.g., Wedow v. City of Kansas City, Mo., 442 F.3d 661 (8th Cir.2006) (city employer’s failure to provide adequate facilities constituted "adverse employment action” for Title VII). But Peck did not indicate that she was challenging Elyria's conduct under 42 USC § 2000e-2(a)(2), which outlaws an employer's decision to "limit, segregate, or classify” job applicants based on sex, nor did the parties brief that issue.

. Although the decision to remove a candidate from consideration after being accused of sex discrimination might amount to impermissible retaliation under Title VII, Peck did not plead a retaliation claim and has never attempted to argue that Elyria’s response to her attorney's letter was retaliatory. Thus, here, we credit the impulse, as the district court put it, "not to hire a lawsuit," among the nondiseriminatory reasons articulated by Elyria.

. The dissent finds Cicero "inapposite” because, in its view, "Sprague repeatedly and consistently testified that she was considering Peck for other jobs.” To the contrary: Sprague’s affidavit states that she "reviewed the application and determined that Ms. Peck was seeking a job as either a Tow Motor Operator or a Grinder.” Elyria's interrogatory responses, which Sprague verified, state only that the "Company still held the application in the event that a tow motor position might become available” and Elyria’s motion for summary judgment did not take the position that Peck was considered for other jobs.

. Despite its view that Sprague "repeatedly and consistently” stated that Peck was considered for other jobs, the dissent nevertheless invokes the "honest belief rule” and finds that "Elyria had an honest and reasoned belief that Peck was applying for two specific positions because those were what Peck clearly listed on her application.” The simultaneous application of the “honest belief rule” and protestation that Peck was considered for other positions only highlights the confusing and inconsistent testimony in the record and further emphasizes the presence of a genuine issue of material fact.

. Elyria's contention that the letter from her attorney ruined her chances at employment does not explain why Sprague did not call Peck for an interview during the eight weeks between when she applied and when Elyria received the letter. The evidence shows that Elyria hired at least twenty-two men for various positions during that time period, some within days of their application and several without any foundry experience.

. Of course Peck bears the burden of showing that Elyria's reasons were pretextual. We simply observe here that Elyria’s passing speculation that “it is quite possible that Peck's physical limitation would have prevented her from holding any of these other positions,” lacks any supporting evidence and does not distinguish Peck's qualifications from male applicants with respect to non-grinder positions.