[Cite as *Putney v. Contract Bldg. Components*, 2009-Ohio-6718.]


IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY


SHARON PUTNEY,

     PLAINTIFF-APPELLANT,          CASE NO.  14-09-21

     v.

CONTRACT BUILDING
COMPONENTS, ET AL.,          O P I N I O N

     DEFENDANTS-APPELLEES.


Appeal from Union County Common Pleas Court
Trial Court No. 08-CV-0402

Judgment Affirmed

Date of Decision:    December 21, 2009


APPEARANCES:

    *Judith E. Galeano and Merl H. Wayman*  for Appellant

    *Susan C. Rogers and Amanda L. Walls*  for Appellees

Case No. 14-09-21

**SHAW, J.**

{¶1} Plaintiff-appellant, Sharon Putney (hereinafter "Putney"), appeals the June 17, 2009 judgment of the Common Pleas Court of Union County, Ohio, granting summary judgment in favor of the defendants-appellees, Contract Building Components, Ltd. (hereinafter "CBC"), and Stark Truss Company, Inc. (hereinafter "Stark Truss"), and dismissing her complaint.

{¶2} The facts relevant to this appeal are as follows. CBC is a manufacturer of building components. Stark Truss operates CBC. Putney began working at CBC's Marysville, Ohio, plant in May of 2002, through Stark.[1] Putney's title was that of office manager. As office manager, Putney was responsible for day-to-day administrative matters, such as maintaining the lumber summary and inventory, coordinating personnel data and documents, recording trucking logs, and managing the billing by gathering invoices, submitting them for payment approval to the plant manager, Jeff Coulter,[2] who was also her direct supervisor, and then assuring they were paid. Putney was not responsible for any aspect of production, and she did not serve in a supervisory position.

{¶3} Shortly after her employment began, problems arose with her performance. For the next few years, Putney received multiple disciplinary actions in the form of written notices and poor performance reviews from Coulter.

---

[1] Stark Truss also operates another facility in Washington Courthouse, Ohio.
[2] Coulter is also the plant manager for Stark Truss' Washington Courthouse facility.

Many of the critiques of her performance revolved around her inaccurate record keeping and problems with properly invoicing. By June 29, 2005, Putney's performance review reflected a below average performance in every category of review from attendance to communication to teamwork. In this review, Coulter noted that he had to remind Putney to do tasks and then had to check to see if she actually did the tasks. Coulter also noted that Putney was continuing to make mistakes in her record keeping and not properly invoicing, including failing to invoice $37,000.00 worth of product.

{¶4} On September 13, 2006, Putney received another written disciplinary notice from Coulter. This notice stated: "On Thursday 9-7-06 I received 2 invoices from Sharon for approval that did not have our purchase order with it. I have asked Sharon for years now to make sure this happens and she fails to follow instructions. Poor performance will no longer be tolerated!" This notice also provided that the consequence, should the incident be repeated, would possibly be a three-day suspension.

{¶5} Two days later, Putney sent a letter to Mike Dyer, the director of human resources for Stark Truss, alleging harassment of her by Coulter. In this letter, Putney cited several things that Coulter had said to her to demonstrate what she perceived to be a hostile work environment. She further alleged that Coulter's

statements and actions were gender-based and that she feared retaliation. Dyer gave this letter to Alice Wehrlin, nka Alice Mize, for investigation.

{¶6} After speaking with Putney and investigating the complaint, Wehrlin determined that the claim was meritless and that the comments by Coulter about Putney's performance were due to her below average performance. As a result, Wehrlin offered Putney two hours of additional training with Darlene Merritt, Putney's counterpart at Stark Truss' facility in Washington Courthouse, Ohio. Wehrlin also requested that Putney provide her with copies of any company documents relating to other employees that Putney admittedly made. In addition, Wehrlin began working with Coulter to ensure that there was no retaliation for Putney's actions and that any disciplinary action taken against Putney in the future would be for job performance-related issues only.

{¶7} Putney did not seek additional training from Darlene Merritt. On October 6, 2006, Wehrlin advised Coulter to issue Putney a three-day disciplinary suspension for failing to perform two basic requirements of her job as office manager, including failing to ensure that CBC was invoiced for what it ordered, failing to ensure that CBC received the shipment in full, and failing to include the order form, the purchase order, and the bill of lading for the order when she submitted the invoice to Coulter. Attached to the written notice of her suspension was an invoice from a company called "Mitek" to a company called "84 Lumber"

not CBC and/or Stark Truss, as well as e-mail communications between Coulter and Putney regarding her work.

{¶8} The written notice of suspension also noted that Coulter was paying another person "to double check [Putney's] work to avoid the costly consequences of her unsatisfactory work. Sharon needs to focus only on her job and stop focusing on everyone else." Further, the stated consequence, should this incident be repeated, was "discipline up to and including termination." Putney was also notified that upon returning to work from this suspension that she would be on probation for sixty days and that if she failed or refused "to make significant improvements, [CBC] reserve[d] the right of immediate termination."

{¶9} On October 11, 2006, Putney wrote another letter to Mike Dyer. This time the letter expressed disagreement with her suspension and with the conclusion reached by Wehrlin regarding her allegations of a hostile work environment. Putney also included in this letter that the "hostile work environment has escalated since my complaint in March, 2006, to OSHA for health/safety hazards that were reported due to diesel powered forklifts being used in an unventilated building at Contract Building Components." In addition, Putney attached the documents regarding other employees that Wehrlin had previously requested that she turn over. Putney asserted that these documents supported her position that she was unable to perform her job in a timely and

competent manner because other people at CBC were failing to provide her with the paperwork and information that she needed to complete her tasks.

{¶10} Once again, Wehrlin addressed Putney's complaint and informed Putney that her allegations were unfounded. This time Wehrlin specifically addressed the documents Putney attached in support of the hostile work environment claim and explained why she did not find that they supported Putney's claims. Further, Wehrlin informed Putney that Stark Truss was unaware that Putney was the one who reported the company to the Occupational Safety and Health Administration ("OSHA") because OSHA does not reveal this type of information.

{¶11} Upon returning from her suspension, Putney received additional training from Darlene Merritt and her performance appeared to improve during her probationary period. However, after her probationary period ended, Putney began having problems once again. On February 2, 2007, Putney's employment was terminated. The written notice of this termination stated that Putney had failed to make a significant improvement in her performance and continued to submit invoices without the necessary documentation, continued to inaccurately maintain inventory records, and continued to conduct non-job-related activities despite being told to cease such behavior.

{¶12} On August 5, 2008, Putney filed a complaint, naming CBC and Stark Truss as defendants. The complaint alleged three causes of action against both defendants: (1) gender discrimination in violation of R.C. 4112 et. seq.; (2) wrongful termination in violation of public policy; and (3) retaliation for engaging in protected activity in violation of R.C. 4112.02(I). The defendants filed their answer to the complaint, and the matter proceeded to discovery. During discovery, numerous depositions were taken. On January 30, 2009, the defendants filed a motion for summary judgment. Putney filed a memorandum in opposition to this motion on February 17, 2009, and the defendants subsequently filed their reply brief.

{¶13} Thereafter, the trial court granted the defendants' motion for summary judgment on May 6, 2009. This judgment was appealed in appellate case number 14-09-20, but this Court dismissed this appeal on June 17, 2009, for want of jurisdiction because the complaint was not dismissed pursuant to the grant of summary judgment. That same day, the trial court issued an entry both granting summary judgment in favor of the defendants and dismissing Putney's complaint.

{¶14} This appeal followed, and Putney now asserts four assignments of error.

## FIRST ASSIGNMENT OF ERROR

**THE LOWER COURT ERRED BY CONCLUDING THAT APPELLANT FAILED TO ESTABLISH A PRIMA FACIE**

**CASE OF GENDER DISCRIMINATION IN VIOLATION OF R.C. 4112.02(A).**

**SECOND ASSIGNMENT OF ERROR**

**THE LOWER COURT ERRED BY CONCLUDING THAT APPELLANT FAILED TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION IN VIOLATION OF R.C. 4112.02(I).**

**THIRD ASSIGNMENT OF ERROR**

**THE LOWER COURT IMPROPERLY GRANTED SUMMARY JUDGMENT ON APPELLANT'S GENDER DISCRIMINATION AND RETALIATION CLAIMS ON AN ISSUE THAT WAS NEVER RAISED IN APPELLEE'S MOTION FOR SUMMARY JUDGMENT.**

**FOURTH ASSIGNMENT OF ERROR**

**THE LOWER COURT ERRED BY CONCLUDING THAT APPELLANT DID NOT MAKE OUT A PRIMA FACIE CASE OF WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY.**

*Summary Judgment Standard*

{¶15} Each of Putney's four assignments of error challenges the trial court's decision to grant summary judgment in favor of the defendants. An appellate court reviews a grant of summary judgment independently, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991. The standard of review for a grant of summary judgment is de novo. *Hasenfratz v. Warnement*, 3rd Dist. No. 1-06-03, 2006-Ohio-2797, citing *Lorain Nat'l. Bank v. Saratoga Apts.* (1989),

61 Ohio App.3d 127, 572 N.E.2d 198. A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); see *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196, 1995-Ohio-286, paragraph three of the syllabus.

{¶16} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ.R. 56(E). In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in

favor of the non-moving party. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Thus, it is within these constructs that we address each of Putney's assignments of error.

{¶17} For ease of discussion, we elect to first address the third assignment of error.

*Third Assignment of Error*

{¶18} Putney's third assignment of error involves the trial court's determination that summary judgment was proper as to the gender-discrimination and retaliation claims against CBC and Stark Truss because the defendants articulated a legitimate, non-discriminatory reason for terminating her. However, Putney asserts that the defendants did not raise this as a basis for summary judgment in their motion, and, therefore, she was not provided a meaningful opportunity to address this issue.

{¶19} Putney correctly indicates, as stated in the aforementioned summary judgment standard, that "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." *Mitseff*, 38 Ohio St.3d at syllabus; see also, *State ex rel. Sawicki v. Court of Common Pleas of Lucas Cty.*, 121 Ohio St.3d 507, 905 N.E.2d 1192, 2009 -Ohio- 1523, at ¶¶ 26-27. However, Putney fails to acknowledge the repeated assertions by CBC and Stark Truss in

their motion for summary judgment that Putney was disciplined and her employment terminated because of her poor performance.

**{¶20}** On page two of their motion, entitled "Introduction", the defendants stated: "Beginning with a mediocre performance review in the year 2003, Putney's performance steadily deteriorated while incidents of Putney's mistakes and missed deadlines mounted until these persistent, documented, and uncorrected performance issues culminated in the termination of her employment in February of 2007." On page four of this motion, the defendants stated: "All employment actions Stark Truss took with respect to Putney were for legitimate, non-discriminatory business reasons and were based upon her record of performance deficiencies, not her gender[.]" The defendants then delineated Putney's history of unsatisfactory performance and the actions taken by Coulter in the portion of their motion entitled, "Factual Background", and further asserted that Putney was terminated because she did not adequately fulfill her duties with her employer. (Mot. for Sum. Judg., p. 10.)

**{¶21}** Under the "Law & Argument" section of their motion, CBC and Stark Truss stated at the beginning of the portion of the motion regarding Putney's gender-discrimination claim that "Stark Truss and CBC disciplined and ultimately terminated the employment of Putney because of her persistent refusal or inability to perform the requirements of the position of Office Manager, not because she is

a female." (id. at p. 11.) At the beginning of their discussion of Putney's retaliation claim, the defendants stated: "Stark Truss and CBC disciplined and ultimately terminated Putney from employment because of her well-documented and uncorrected performance issues (which pre-dated her participation in any activity protected under Ohio Revised Code ('ORC') §4112.02(I) and persisted even after her alleged participation occurred), not in retaliation for her participation in activity protected by law." (id. at p. 16.) This same assertion was repeated in the portion of the defendants' motion regarding Putney's claim for unlawful termination in violation of public policy based upon the report she made to OSHA. (id. at p. 18.) Further, under this portion, CBC and Stark Truss specifically stated: "As has been thoroughly explained throughout this memorandum, Putney's employment was terminated due to her persistent, documented, and uncorrected job performance issues." (id. at p. 22.)

{¶22} In addition to the multitude of statements by CBC and Stark Truss as to the reason for Putney's disciplines and termination, the defendants also attached to their motion, as did Putney in her response to this motion, numerous documents evidencing Coulter's dissatisfaction with Putney's performance, illustrating where the problems were and explaining the future consequences.

{¶23} In sum, throughout the motion for summary judgment the defendants made it abundantly clear that summary judgment in their favor was proper

because, inter alia, they had a legitimate, non-discriminatory and non-retaliatory reason for terminating her. Thus, Putney's assertion in this regard is without merit, and the third assignment of error is overruled.

*First Assignment of Error*

{¶24} In her first assignment of error, Putney maintains that the trial court erred in granting summary judgment in favor of the defendants on her claim of gender discrimination. Revised Code section 4112.02 provides in relevant part:

**It shall be an unlawful discriminatory practice:**

**(A)   For any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.**

The Ohio Supreme Court has stated that state courts may apply "federal case law interpreting Title VII of the Civil Rights Act of 1964 * * * to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm., et al*. (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128. Therefore, this Court may look to federal case law in addition to state law to determine resolution of this matter.

{¶25} The United States Supreme Court has held that in order "[t]o establish a prima facie case of discrimination, a plaintiff must show: (1) membership in a protected class; (2) qualification for the position; (3) an adverse

employment action; and (4) replacement by a non-protected person." *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817.  However, "[a] plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that 'a comparable non-protected person was treated better.'" *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582 (internal citations omitted).[3]  Under this element, a plaintiff "must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Id*. at 582-83.

**{¶26}** Once a plaintiff establishes his/her prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Texas Dept. of Comm. Affairs v. Burdine* (1981), 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94.  "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretext for discrimination." *Id*.

**{¶27}** Here, there is no dispute that Putney was a member of the protected class, as a female, or that she suffered an adverse employment action, specifically

---

[3] Putney could have alternatively established her prima facie case by presenting credible, direct evidence of discriminatory intent.  See *Terbovitz v. Fiscal Court of Adair County*, Ky. (C.A. 6, 1987), 825 F.2d 111.  However, she acknowledges that she does not have any such direct evidence and, therefore, we proceed solely with the application of the McDonnell Douglas/Burdine formula.

that her employment was terminated. In addition, Putney does not dispute that she was replaced by another member of the protected class, as Darlene Merritt, a female, absorbed Putney's duties as office manager for the Marysville location. The parties' dispute lies in the two remaining elements: (1) that Putney was qualified for the position and (2) that a comparable non-protected person was treated better.

**{¶28}** When evaluating a plaintiff's prima facie burden of showing that she was qualified for the position, the United States Sixth Circuit Court of Appeals has held:

> **a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. See *Aka v. Washington Hosp. Ctr.* (D.C.Cir., 1998), 156 F.3d 1284, 1298 (en banc) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution," and that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination"); *MacDonald v. E. Wyo. Mental Health Ctr.* (C.A.10, 1991), 941 F.2d 1115, 1121 (holding that a plaintiff can show that she is qualified by presenting "credible evidence that she continued to possess the objective qualifications she held when she was hired"). The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills. (Emphasis omitted.)**

*Wexler v. White's Fine Furniture, Inc*. (C.A.6, 2003), 317 F.3d 564, 575-76.

{¶29} Stark Truss and CBC assert that Putney was not qualified for the position of office manager because her poor performance over the years demonstrated that she was not qualified for the job. However, *Wexler* requires that we consider only the objective criteria for the position rather than the employer's subjective evaluations, which are more properly examined in determining whether the employer has provided a legitimate, non-discriminatory reason for termination and whether such reason is a mere pre-text.

{¶30} In examining whether Putney was qualified for the position, the evidence before the trial court is devoid of what objective criteria were necessary for Putney's employment as an office manager, such as education, training, etc. However, in the documentation submitted by Stark Truss in its motion for summary judgment, Coulter and Darlene Merritt provided statements that Putney was qualified to perform as the office manager. Specifically, in Merritt's affidavit, she stated that she provided training to Putney on several occasions and "felt that Sharon Putney *was capable of performing the requirements of the position of Office Manager* but lacked interest or motivation in the job." (Emphasis added.) (Merritt Aff. at ¶ 7.) Additionally, in Coulter's February 2, 2007, written notice of Putney's termination, he wrote: "While [Putney] did make some improvement during her probationary period she has reverted back to her poor performance which demonstrates that Sharon *has the ability to do the job but chooses not to do*

*so*." (Emphasis added.) Given these statements by the two people in Stark Truss' employ who were in the best position to determine Putney's qualifications and in construing the evidence in a light most favorable to Putney, we find that Putney has satisfied her prima facie burden as to this element.

{¶31} The next consideration is whether for the same or similar conduct, Putney was treated differently than similarly-situated male employees. The Sixth Circuit has held that "to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.* (C.A. 6, 1998), 154 F.3d 344, 352, quoting *Mitchell*, 964 F.2d at 583.

{¶32} The court in *Ercegovich*, however, cautioned courts in future cases "that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but [courts] should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* Accordingly, a plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;'

rather, * * * [they] must be similar in 'all of the *relevant* aspects.'" *Id.*, quoting *Pierce v. Commonwealth Life Ins. Co.* (C.A.6, 1994), 40 F.3d 796, 802. Such a standard protects those employees who occupy "unique" positions, who would otherwise be unable to show work-place discrimination, "save in those rare cases where the plaintiff produces direct evidence of discrimination." *Ercegovich*, 154 F.3d at 353.

**{¶33}** In this case, Putney asserts that she had a unique position at CBC. Thus, she bases her gender-discrimination claim on the more favorable treatment she alleges that her similarly-situated male co-workers received. We find her argument is flawed in two respects. First, while her position as office manager was unique at the CBC facility in Marysville, it was not a unique position for Stark Truss. In fact, on more than one occasion, Putney was provided training through Darlene Merritt. As previously noted, Merritt was Stark Truss' office manager for its Washington Courthouse facility. Merritt had the same responsibilities as Putney, simply at another location. Putney acknowledges that Coulter repeatedly compared her to Merritt, asked her why she could not perform in the same manner as Merritt, and referred her to Merritt for additional training. When confronted by Coulter in this regard, the only dissimilarity Putney could articulate was that Merritt had been the office manager for a longer period of time. Thus, Putney is not in that line of plaintiffs who are in a "unique" position and must find a

similarly-situated employee who is not a member of the minority class. Rather, Putney has a direct comparison, Merritt, who is a member of the same protected class as Putney, a female. As such, Putney cannot make a prima facie case as to the fourth element of a gender-discrimination claim.

{¶34} Second, even assuming *arguendo* that Putney is in a unique position, Putney cannot demonstrate that a similarly-situated male was treated more favorably than she. Although Putney attempts to demonstrate that she is similarly-situated to a few of the male employees at CBC because she and these men were considered "key" employees at CBC, simply labeling an employee as a "key employee" does not render that person similarly-situated. In fact, Putney stated in her deposition that "[n]obody else did the same responsibilities[.]" (S. Putney Depo., p. 70.)

{¶35} Putney's supervisor was Coulter, the plant manager. The evidence demonstrates that the only other people who directly reported to Coulter were Bill Pressler and Doug Irvine. However, Pressler, as production manager, was a supervisor responsible for the production aspect of the business, and Doug Irvine was a truss technician, a position also related to the production aspect of the business. Putney, on the other hand, was responsible for purely administrative matters, and her performance in no way affected production. Additionally, she did not have any supervisory authority. Although Pressler was responsible for some

of the paperwork that Putney needed regarding employee hours and driver mileage, the responsibility for this paperwork was his only similarity to Putney. Clearly, other than all three holding important positions in the company, i.e. "key positions", Pressler's and Irvine's positions in the company were not similar to Putney's in any relevant aspects.

{¶36} Further, there was no evidence that Pressler or Irvine were performing the various aspects of their jobs in an unsatisfactory manner, other than Pressler submitting paperwork on occasion that omitted some information from the other workers such as hours and mileage. In fact, there is nothing in the record, except for one write-up of Pressler for an OSHA violation, that either man was affecting production or the deliveries of products in a negative manner or that their performance was below average.

{¶37} Moreover, the type of paperwork Putney claims a number of other employees were not timely giving to her and for which they were not being disciplined was but one area of Coulter's concern of Putney's performance. As is the case with her comparisons to Pressler, the type of paperwork that she maintains that she did not timely and accurately receive was but one aspect of her administrative function and had little to nothing to do with the majority of her performance issues. To the contrary, much of the discipline she received, including her ultimate termination, were for submitting invoices without purchase

orders, not accurately invoicing items, not ensuring that bills were paid in a timely fashion, working on personal matters, not keeping her work area clean and organized, submitting invoices for approval that were actually for other companies, and neglecting to make required adjustments in her reports. In one such discipline, Coulter noted that the company's credit rating was suffering as a result of mishandled billing by Putney. The record is devoid of any evidence that the conduct of the male employees with whom Putney compares herself affected the company's credit rating or resulted in incorrect invoicing.

{¶38} In addition, Putney submitted discipline records of a number of other employees to demonstrate her disparate treatment. However, the other employees involved were all assigned to production and/or shipping, not the office. Administrative matters, including paperwork, were the crux of Putney's job. Production and deliveries of the company's product were the main responsibilities of the other people with whom Putney attempts to compare herself. Further, how these employees were in any way similarly-situated to Putney is not demonstrated in the record before us.

{¶39} The issues stated in the documentation of these employees' disciplinary actions were for a variety of things: tardiness, excessive absences, an employee who repeatedly did not wear his safety glasses, and an employee who was careless on one occasion and broke a light. Another instance cited by Putney

was Pressler's discipline for an OSHA violation of allowing forklifts to be operated in unventilated areas.

**{¶40}** Putney also references Dan Kinnison's treatment by Coulter in support of her disparate treatment claim. Kinnison, who was the dispatcher for deliveries and responsible for gathering information from the drivers, received a write-up for having pornography on his computer. However, Kinnison testified in his deposition that he disputed his discipline for having pornography because others had access to his computer. He further testified that there was never pornography on his computer again. Another employee also testified in his deposition that Kinnison was found sleeping in his car during working hours. However, this employee stated that he did not know whether Kinnison was on his break or not at the time he was found sleeping in the car. Kinnison also appears to be the person Putney most often had difficulty with in obtaining driver-related paperwork. Kinnison was not terminated by Stark Truss. Thus, Putney contends that he received better treatment despite his various issues.

**{¶41}** Putney was not disciplined for safety concerns, having pornography, or sleeping on the job. As previously noted, throughout her nearly five years of employment, Putney was given mostly below average reviews in every category: attendance, quality commitment, communication, taking initiative, job skills, housekeeping, teamwork, and customer satisfaction. She was repeatedly told that

she was the office manager and needed to stay on top of all administrative matters, including accurately maintaining lumber inventory, logs, and summaries as she made repeated mistakes in this regard and tracking down the paperwork she needed when the production and/or shipping employees neglected to provide her with the necessary documents.

{¶42} Putney also presented evidence, through the deposition testimony of other company employees, that other employees did not receive any disciplinary action for making personal phone calls during working hours, using the company cell phones to place personal calls, using company vehicles for personal business, and using the Internet for personal reasons during working hours, yet she was disciplined for handling personal matters during working hours. While others did admit to engaging in these non-work-related activities, there is nothing in the record to demonstrate that their work suffered because of these things. In addition, there is nothing in the record that any of these actions were disruptive, unlike the discipline Putney received in August of 2006, wherein Coulter noted that she continuously made and received *disruptive* calls.

{¶43} Furthermore, Putney's issues, including these disruptive personal calls, were all related to the *performance* of her job. Nothing in the record illustrates that the issues with other employees had directly affected their *performance*, i.e. the actual production and/or shipping of the company's product.

On the other hand, Putney's issues directly affected whether her tasks were completed, when they were completed, and whether they were completed accurately. There is also nothing in the record to indicate that anyone else had as many *performance* issues as Putney or that these issues, many of which were isolated, lasted for nearly the entire length of their employment, as was Putney's. Thus, Putney cannot make a prima facie case as to the fourth element of her gender-discrimination claim based upon being treated differently than male employees for same or similar conduct.

{¶44} However, even assuming *arguendo* that Putney has satisfied this element and can establish a prima facie case for gender discrimination, Stark Truss and CBC have articulated a legitimate, non-discriminatory reason for her termination, which Putney cannot show is false. As previously noted, throughout this litigation, including the motion for summary judgment, Stark Truss and CBC have maintained that Putney was disciplined and ultimately terminated due to her inability to perform her job in a satisfactory manner, and they have provided documentation and affidavits to support this position. This is a legitimate, non-discriminatory reason for her termination.

{¶45} Finally, in her deposition, Putney admitted that she had numerous performance issues. While she asserts that she could not perform her job because others were not giving her paperwork in a timely manner and were giving her

incomplete and/or inaccurate paperwork, as we have discussed at length, this affected but one portion of her job. This failure by others did not cause Putney to submit invoices for approval to Coulter for other companies that were mistakenly sent to CBC, to omit purchase orders for invoices, to have a messy and disorganized work area, to make and receive disruptive calls, or to have a number of the other issues that she had. Thus, the record is devoid of any evidence that the stated reason for her termination was false and that the true reason was because of her gender.

{¶46} Accordingly, for all of these reasons, Putney's first assignment of error is overruled.

*Second Assignment of Error*

{¶47} In her second assignment of error, Putney contends that the trial court improperly granted summary judgment in favor of CBC and Stark Truss on her retaliation claim. Revised Code section 4112.02(I) prohibits retaliation and states:

> **It shall be an unlawful discriminatory practice \* \* \* [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112 .07 of the Revised Code.**

As with gender-discrimination claims, state courts may look to federal case law regarding cases involving alleged retaliation. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128.

**{¶48}** To establish a prima facie case of retaliation, Putney must demonstrate: "(1) that she engaged in protected activity; (2) that the employer knew of her exercise of protected rights; (3) that she was the subject of [materially] adverse employment action; and (4) that there is a causal link between the protected activity and the adverse employment action." *Price v. Matco Tools*, 9th Dist. No. 23583, 2007-Ohio-5116, at ¶ 38, citing *Balmer v. HCA, Inc.* (C.A.6, 2005), 423 F.3d 606, 614; see also *Burlington Northern & Santa Fe Ry. Co. v. White* (2006), 548 U.S. 53, 67-68, 126 S.Ct. 2405 (modifying the third element of the prima facie case to require a "materially adverse" action rather than an "adverse employment action").

**{¶49}** If Putney can establish "a prima facie case of retaliation, the burden then shifts to the defendant[s] 'to articulate a legitimate reason for [their] action.'" *Bennett v. Roadway Express, Inc.* (Aug. 1, 2001), 9th Dist. No. 20317, 2001 WL 866261, quoting *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.* (1994), 99 Ohio App.3d 396, 402, 650 N.E.2d 950. "If that burden is met, the burden then shifts back to the plaintiff 'to show that the articulated reason was

merely a pretext.'" *Bennett*, supra, quoting *Chandler*, 99 Ohio App.3d at 402. Further, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 515, 113 S.Ct. 2742.

**{¶50}** Putney's retaliation claim stems from her September 15, 2006 letter to Mike Dyer alleging that Coulter had created a hostile work environment in violation of company policy and discriminated against her because of her gender. The parties do not dispute that Putney engaged in protected activity, that Coulter knew of this activity, or that Putney was the subject of an adverse employment action. Rather, the dispute between the parties is over the element that there must be a causal link between the protected activity and the adverse employment action.

**{¶51}** To demonstrate a causal connection between a materially adverse action, such as suspension or termination, and the exercise of protected rights, "a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.* (C.A. 6, 2007), 496 F.3d 584, 596, citing *Dixon v. Gonzales* (C.A. 6, 2007), 481 F.3d 324, 333. In other words, "a plaintiff must produce evidence which permits the inference that apart from the protected activity, the adverse action would not have been taken." *Nguyen v. City of Cleveland* (C.A.6, 2000), 229 F.3d 559, 563. This determination is made with reference to the surrounding

circumstances, including "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights[.]" *Id*.; see also *Lindsay v. Children's Hospital Medical Center of Akron*, 9th Dist. No. 24114, 2009-Ohio-1216, at ¶ 13.

**{¶52}** Generally, mere temporal proximity between a protected activity and a materially adverse action without other indicia of retaliatory conduct is not sufficient to establish the causal connection element of a retaliation claim. See *Michael*, 496 F.3d at 596; *Tuttle v. Metro. Gov't of Nashville* (C.A. 6, 2007), 474 F.3d 307, 321; *Little v. BP Exploration & Oil Co.* (C.A. 6, 2001), 265 F.3d 357, 363-64; *Nguyen*, 229 F.3d at 563; *Johnson v. University of Cincinnati* (C.A. 6, 2000), 215 F.3d 561, 582-83. "[T]his is particularly true when the evidence demonstrates intervening performance concerns." *Nguyen*, 229 F.3d at 566-67, citing *Cooper v. City of North Olmsted* (C.A.6, 1986), 795 F.2d 1265, 1272.

**{¶53}** However, the Sixth Circuit has recently clarified that, in a small subset of cases, temporal proximity alone may be sufficient to establish causality:

> **Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory**

**conduct to establish causality.** *Mickey v. Zeidler Tool & Die Co.* **(6th Cir. 2008), 516 F.3d 516, 525 (finding temporal proximity alone to be sufficient when the defendant fired the plaintiff on the same day in which it learned that the plaintiff had filed an EEOC complaint); see also** *Clark County Sch. Dist. v. Breeden***, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but that they have only done so when the temporal proximity is "very close");** *Singfield v. Akron Metro. Hous. Auth.***, 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of three months was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case");** *DiCarlo v. Potter***, 358 F.3d 408, 421 (6th Cir. 2004) ("[T]his Circuit has embraced the premise that in certain distinct cases where temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").**

*Evans v. Prospect Airport Serv., Inc.* (C.A. 6, 2008), 286 Fed. Appx. 889, 895.

Nevertheless, "[e]mployers need not suspend previously contemplated employment actions upon learning of protected activity by the employee." *Warren v. Ohio Dept. of Pub. Safety* (C.A. 6, 2001), 24 Fed. Appx. 259, 266.

{¶54} Here, Putney relies upon temporal proximity alone. Specifically, she points out that she wrote her letter to Dyer on September 15, 2006, and Wehrlin and Coulter knew of this shortly thereafter. Three weeks later, on October 6, 2006, she was suspended for three days and placed on probation. Putney contends

that this constitutes indirect evidence of retaliation to support her prima facie case as to this element.

**{¶55}** However, the facts demonstrate that Putney wrote her letter of September 15th two days after receiving a write-up for submitting two invoices to Coulter without a purchase order as required. Coulter wrote: "I have asked Sharon for years now to make sure this happens and she fails to follow instructions. *Poor performance will no longer be tolerated!*" (Emphasis added.) In addition, this evaluation stated that the consequence, if the incident was repeated, would possibly be a *three-day suspension*. According to Wehrlin, she advised Coulter to take disciplinary action against Putney on October 6, 2006, after Putney committed two serious errors that were basic requirements of her position and failed to acquire additional training from Merritt, as was offered to her by Wehrlin in a letter to Putney, dated September 21, 2006, regarding the results of Wehrlin's investigation of Putney's discrimination and hostile work environment complaint.

**{¶56}** This time Putney had failed to submit the computer generated order form, the purchase order, and the bill of lading for an invoice and gave Coulter an invoice that was for another company, 84 Lumber. As a result, Coulter suspended Putney and placed her on probation. In this write-up, Coulter noted that he was paying someone to double check Putney's work to avoid costly consequences, that

Putney was not focusing on her job but was focusing on whether everyone else was doing their job, and she was keeping a log of when she believed others were not doing their job which resulted in her being unproductive. Putney was warned that subsequent issues could result in further discipline, including termination.

{¶57} Under these circumstances, which are not in dispute, we do not find that this case falls within that small subset of cases where temporal proximity alone may be sufficient to establish causality. Here, Coulter had decided on September 13, 2006, that further performance failures, particularly submitting invoices without a purchase order, would result in Putney's suspension. Thus, he made an employment decision prior to Putney's protected activity. This is distinctly different than the rare cases cited by the Sixth Circuit in *Evans*, where temporal proximity alone was sufficient, as the employers in those cases had not pre-determined a course of action to take with their employees until after the employee engaged in protected activity.

{¶58} Further, Putney performed poorly for nearly the entire time she was employed by Stark Truss. Her issues were repeatedly addressed, and her suspension and subsequent termination were for problems she had for years that continued despite warnings and progressive discipline. To tie the employer's hands in a case such as this where the employee only engaged in protected activity on the immediate heels of receiving notice that her performance issues would no

longer be tolerated and would result in suspension is a course this Court will not take. Nor will this Court allow temporal proximity alone to suffice when the employee is disciplined/terminated for the same problematic performance he/she engaged in both prior and subsequent to his/her protected activity without other indicia that there is a causal link between the protected activity and the adverse employment action. Thus, Putney cannot satisfy her prima facie burden as to the causality element.

{¶59} Once again, even assuming *arguendo* that Putney could establish a prima facie case, the burden then shifts to the defendants to state a legitimate reason for her termination. As previously noted in our discussion of the first and third assignments of error, Stark Truss and CBC have done so, and Putney cannot show that this reason was pre-textual. Therefore, for all of these reasons, the second assignment of error is overruled.

*Fourth Assignment of Error*

{¶60} Lastly, Putney asserts that the trial court erred in granting summary judgment to the defendants on her claim for wrongful termination in violation of public policy for filing a complaint with OSHA. In order to establish a claim for wrongful termination in violation of public policy, Putney must show: (1) a clear public policy existed and was manifested in a state or federal law (the clarity element); (2) that dismissing employees under circumstances like those involved

in Putney's dismissal would jeopardize the public policy (the jeopardy element); (3) Putney's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653, 1995-Ohio-135 (citations omitted).

{¶61} As to this issue, the parties do not dispute the first and second elements. Rather, Putney asserts that the trial court incorrectly determined that her termination was not motivated by conduct related to her reporting an OSHA violation and that CBC and Stark Truss had an overriding legitimate business justification for her dismissal.

{¶62} In order to demonstrate the causation element, Putney had to show that her dismissal was motivated by the report she made to OSHA. Thus, she must first show that the defendants were aware she made a report, when they were aware, and that their knowledge motivated their actions.

{¶63} The parties do not dispute that a report was made to OSHA in late March of 2006, regarding the use of gasoline and/or diesel fueled forklifts in enclosed areas in the building. In her deposition and affidavit, Putney asserted that Coulter confronted her in April of 2006, about whether she was the one who

made the report. Although she stated that she told him that she had not made the call, she claims that Coulter told her, "I don't believe you."

{¶64} In an effort to corroborate her claim that Coulter knew that she contacted OSHA, Putney also points to the deposition of Gerald Spicer, another CBC employee. Spicer testified that Coulter asked him if he had made the report, and when he responded that he had not done so, Coulter asked if he "knew maybe if Sharon had." Spicer was also asked, "Did Mr. Coulter indicate to you that he believed Sharon Putney filed the complaint with OSHA?" Spicer responded, "He didn't come out and say that she did but he had a feeling maybe she might have." When asked what Coulter said that made Spicer believe that Coulter "had a feeling," Spicer was unable to articulate what gave him this impression about Coulter's feelings.

{¶65} Based on these discussions in April of 2006, Putney maintains that Coulter, motivated by his knowledge that she was the complainant, began disciplining her more frequently: on July 25, 2006, August 22, 2006, September 13, 2006 (wherein she was informed that poor performance would no longer be tolerated), October 6, 2006 (resulting in her three-day suspension), and February 7, 2007 (her termination date). She further asserts that this creates a genuine issue of material fact that his actions against her were motivated by her complaint to OSHA.

**{¶66}** Coulter states in his affidavit that he was unaware that Putney was the one who made the report to OSHA until after her employment was terminated in February of 2007. In addition, Wehrlin stated in her affidavit that "no one at Stark Truss or CBC was aware of the identity of the individual who had made the anonymous complaint[,]" prior to Putney's letter to Mike Dyer on October 11, 2006, where Putney specifically stated that she was the OSHA complainant.

**{¶67}** In this case, Putney's assertion that Spicer's deposition testimony corroborates her allegation that Coulter told her that he did not believe her when she told him that she did not contact OSHA is unfounded. Spicer's testimony was that Coulter "had a feeling" that Putney was the complainant. However, Spicer could not provide any explanation for why he thought Coulter "had a feeling" other than Coulter asking him if *he* (Spicer) knew if Putney had made the report. Spicer testified that he told Coulter that he did not know if Putney was the complainant. The subjective belief by one person about how another person "felt" is not corroboration of the other person's knowledge. It is conjecture. Likewise, the fact that Coulter may have questioned Putney about whether she was the one who contacted OSHA and did not believe her when she stated that she had not, does not establish that he *knew* she was the OSHA complainant. Again, this is more conjecture. Such speculation does not satisfy the requirements of Civ.R. 56 to defeat summary judgment.

**{¶68}** However, even if Coulter did suspect that Putney was the OSHA complainant, Putney does not dispute that any of the issues for which she was disciplined in the year 2006 occurred. Further, these were issues for which she was previously disciplined and given poor reviews in 2003, 2004, and 2005. Also of note is that despite perhaps believing in early April of 2006, that Putney was the one who made the report, as Putney claims, Coulter did not discipline her later that month, in May, or in June. Rather, he disciplined her for the first time, in July of 2006, some three months later, for something she actually did and then disciplined her in the months that followed for other *undisputed* issues.

**{¶69}** Moreover, Coulter did not choose to even consider suspension for Putney's failures until some five months later in September of 2006, when she was warned that such failures would no longer be tolerated. In fact, he did not suspend her until she once again committed a critical error in October, some six months after he allegedly "knew" she filed the report. In addition, she was given additional training and a probationary period to improve her performance and was not terminated from her employment until she committed more errors in February, 2007, ten months after Coulter allegedly "knew" she was the complainant. Therefore, even when construing the evidence in a light most favorable to Putney, a jury could not reasonably infer from the evidence that Putney's safety complaint,

not her repeated poor performance, motivated her write-ups, suspension, probation, and termination.

{¶70} Putney has also failed to satisfy the fourth prong. As repeatedly discussed throughout this opinion, the defendants offered evidence of an overriding business justification for Putney's termination, i.e. below average performance. Putney did not produce evidence that the defendants lacked such justification. There was no factual dispute that the performance issues leading to Putney suspension and termination had actually occurred. Accordingly, Putney cannot maintain a wrongful discharge claim as to this element. Therefore, the fourth assignment of error is overruled.

{¶71} For all of these reasons, each of the assignments of error is overruled, and the judgment of the Common Pleas Court of Union County, Ohio, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., and WILLAMOWSKI, J., concur.**

**/jlr**